IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GARY HERLING,
o/b/o A. H., a minor child                                            PLAINTIFF

    v.    Civil No. 07-5138

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                        DEFENDANT

## MEMORANDUM OPINION

  Plaintiff, Gary Herling, brings this action under 42 U.S.C. § 405(g), on behalf of A. H., a minor child, seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying Amanda Herling's (deceased) claims for a period of disability and disability insurance benefits (DIB) pursuant to Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 416(i) and 423.  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**Procedural Background**:

  Amanda filed her applications for DIB and SSI on July 28, 2004, alleging an onset date of January 1, 2001, due to borderline intellectual functioning ("BIF"); mathematics disorder; unspecified learning disorder, major depression, severe with psychotic features; borderline personality disorder; bipolar disorder; and, schizo-affective disorder.  An administrative hearing was held on June 21, 2006.  (Tr. 352-403).  Amanda was present and represented by counsel.

AO72A
(Rev. 8/82)

At the time of the administrative hearing, Amanda was 25 years old and possessed a high school education. (Tr. 22). Although she was employed from time to time, Amanda has no past relevant work experience. (Tr. 22).

On February 13, 2007, the Administrative Law Judge ("ALJ") determined that Amanda suffered from a combination of severe impairments, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 18). After partially discrediting Amanda's subjective complaints, the ALJ determined that Amanda retained the residual functional capacity ("RFC") to perform all levels of exertional work. The ALJ further found that Amanda had a limited but satisfactory ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with supervisors, co-workers, and the general public; and, respond appropriately to work pressures and work changes in a typical work setting. With the assistance of a vocational expert ("VE"), the ALJ then concluded that Amanda could perform work as a waiter, production worker, sewing machine operator, and charge account clerk. (Tr. 23, 130-132).

The Amanda appealed this decision to the Appeals Council, but her request for review was denied on June 2, 2007. (Tr.4-7). Subsequently, Amanda filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 8, 9).

**Applicable Law**:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or

mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion:**

At the onset, we note that this is a DIB case. As such, Amanda has the burden of proving that a disabling condition existed before her insured status expired. *See Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). Amanda was last insured for DIB as of June 30, 2003. (Tr. 15). Thus, the relevant time period in this case is from January 1, 2001, her alleged onset date, through June 20, 2003, the date she was last insured for DIB.

Based on the medical evidence of record, during the relevant time period, the undersigned cannot say that the ALJ's RFC assessment is supported by substantial evidence. The ALJ concluded that Amanda had a limited but satisfactory ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with supervisors, co-workers, and the general public; and, respond appropriately to work pressures and work changes in a typical work setting. However, the medical evidence reveals that Amanda was hospitalized from July 14, 1999, to July 20, 1999, due to severe psychotic features with possible hallucinations and delusions. (Tr. 257-264, 293, 444-446). Her drug screen was positive for cannabis, but the rest of her labs were well within normal limits.

4

(Tr. 258). Amanda was placed on Zyprexa and Prozac. At the time of discharge, Amanda was diagnosed with major depression, severe with psychotic features; cannabis dependence; personality disorder; BIF; and, assessed with a global assessment of functioning score ("GAF") of 45. (Tr. 260). Her prognosis was said to be good for the short term, but guarded for the long-term, due to her maladaptive behaviors. (Tr. 260).

On April 13, 2000, Amanda underwent psychological screening with Dennis Boyer, a psychological examiner. (Tr. 140-142). Testing revealed that Amanda had an IQ of 77, which placed her in the borderline level of intellectual functioning; 7th grade written comprehension skills; and, 4th grade math skills. Mr. Boyer diagnosed Amanda with a mathematics disorder, a learning disability, and assessed her with a GAF of 65. He noted that Amanda would have problems performing computational tasks, obtaining satisfactory grades, and reading advanced technical materials. Mr. Boyer also indicated that Amanda would likely have unrealistic vocational objectives and difficulty with advanced computation or mathematics. He stated that his findings reflected significant variability among skill areas examined, in a manner that was often associated with learning disabilities, which resulted in a mild/moderate impairment in the capacity to acquire vocational skills. However, if provided with semiskilled training, such as that available at a local vocational-technical facility, Mr. Boyer stated that Amanda might reasonably be expected to sustain independent functioning by means of competitive employment. (Tr. 142).

On August 20, 2002, Amanda presented to Dr. Poemoceah wanting to discuss an article she had read about bipolar disorder. (Tr. 165). He noted that Amanda had been treated by various counselors and psychiatrists in the past, and she had tried various medications. She indicated that she became agitated easily and was now hearing voices. Upon further questioning,

5

Amanda became agitated, used profanity, and left Dr. Poemoceah's office. Dr. Poemoceah's notes state "psychiatric situation in NW Arkansas is not optimal at this point by any means." He then gave Amanda samples of Zyprexa. (Tr. 165).

On August 29, 2002, Amanda presented to the Ozark Guidance Center ("OGC") feeling that there was something "chemically wrong" with her. (Tr. 226). She thought she was bipolar. Amanda stated that she had been experiencing anxiety, irritability, mood swings, and emotional reactivity. Further, she felt down on herself, was overly sensitive, and almost paranoid. Amanda was taking Zyprexa, but was not able to sleep due to worry. She stated that she had become suicidal after the birth of her daughter, and was admitted to Charter, but took herself off the medications after she was released. Her symptoms were now reappearing. She was diagnosed with depressive disorder not otherwise specified, personality disorder not otherwise specified, and assessed with a GAF of 45. (Tr. 227-228).

On September 27, 2002, Dr. Tucker noted that Amanda was doing "quite well" on Zyprexa. (Tr. 164). Amanda was taking her medication as prescribed and seeing a counselor. She had also developed a cough, congestion, and difficulty breathing. However, she continued to smoke at least one package of cigarettes per day. Dr. Tucker diagnosed Amanda with persistent bronchitis and administered a Proventil updraft treatment with a moderate amount of improvement. A chest x-ray was clear, but a physical exam revealed some wheezing and rhonchi. Dr. Tucker advised Amanda to quit smoking and prescribed Decadron and Proventil MDI. (Tr. 164).

Amanda returned to OGC in October, November, and December 2002 for individual therapy. (Tr. 214-225). She was tearful and had a lot of anger. (Tr. 224). In November she had

poor insight; a flat, blunted, and sad affect; and, a pessimistic, tearful, and depressed mood. (Tr. 220). Amanda was reportedly looking for work, and had applied for 7 jobs in the past month without success. Records indicate that she had been fired from her hostess job when the cash register began being "short." (Tr. 222). Amanda was also separated from her husband and caring for her young child. (Tr. 216-225).

On January 13, 2003, Amanda still had no job and was undecided about her marriage. (Tr. 214-215). She stated that she did not feel that she had anything to say, as she did not appear motivated to work on personal issues, and stated that she did not want to reschedule her appointment. (Tr. 214).

On October 8, 2003, Dr. Tucker noted that Amanda had a lot of problems with sleep, and was experiencing some agitation. (Tr. 277). He placed her on Risperdal daily. (Tr. 157).

On October 27, 2003, Amanda returned to OGC. (Tr. 213). She was unkept and disheveled with a flat affect, anxious and depressed mood, rambling and sparse speech, and poor insight. (Tr. 212). Amanda was going through a divorce and felt her depression was getting in the way of her being able to get and keep a job. Records indicate that she was suppose to confer with Dr. Brittan about "getting back on meds, like she was after being in Charta Vista." (Tr. 213).

On March 24, 2004, Amanda underwent a mental status evaluation by Dr. Donna Van Kirk. (Tr. 172-177). Physically, Amanda complained of backaches, migraines with dizziness, and "a nonstop headache for the past year and a half." Dr. Van Kirk observed that Amanda was often inappropriate when mildly frustrated; immature; irritable; irresponsible; and, impulsive.

(Tr. 172). She noted that Amanda exhibited exploitive and aggressive behavior and experienced suspicious thoughts that impaired her functioning. Amanda had been diagnosed with bipolar disorder in 1999, but had taken herself off of her medications six weeks prior to this appointment. Records indicate that her mood swings had returned. As such, Dr. Van Kirk diagnosed Amanda with unspecified learning disorders; borderline personality disorder with histrionic traits, paranoid ideas, and unregulated imagination; obesity; problems with learning, employment, social adjustment, and substance abuse; an IQ of 85; and, assessed her with a GAF of 45. Dr. Van Kirk concluded she had learning disabilities and inattentiveness. There were also significant problems with social adjustment, maturity, and alcohol abuse. Amanda's habits and faux hallucinations did not constitute a mental disorder. However, she was unable to work in jobs which required fast-paced decisions, complicated reasoning, money changing, writing, and reading. Dr. Van Kirk stated that she may be able to work in a semi-independent low skilled job, but a payee would be necessary. (Tr. 176).

As the medical evidence makes clear, Amanda has both learning disabilities and psychiatric diagnoses that result in mental limitations. She has been diagnosed with bipolar disorder, personality disorder, and major depression. Doctors have also assessed her with a GAF of 45. A GAF of 45 is indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) and/or impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000). Further, the evidence indicates that Amanda had problems with irritability, frustration, immaturity, irresponsibility, and impulsiveness. She also suffered from learning disabilities that would make it difficult for her to learn to perform jobs without

AO72A
(Rev. 8/82)

special assistance/supervision. However, the ALJ failed to take this into consideration when evaluating Amanda's RFC. As such, we believe remand in necessary to allow the ALJ to properly consider all of Amanda's impairments.

While we note that the medical evidence does suggest that Amanda had abused drugs and alcohol, it is impossible to determine the degree of abuse or use in this case. In fact, the ALJ did not mention either of these problems as factors material to her case. We note that bipolar disorder can precipitate substance abuse as a means by which the sufferer tries to alleviate her symptoms. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). The mere fact that substance abuse aggravates a Amanda's mental illness does not prove that the mental illness itself is not disabling. *Id.*; *Brown v. Apfel,* 192 F.3d 492, 499 (5th Cir. 1999); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998). Accordingly, on remand, the ALJ is also directed to develop the record further in this regard.

The record also notes that Amanda has been non-compliant with her medications at times. However, it is not uncommon for bipolar patients to discontinue their medications at will, especially when they are feeling good. Charolette E. Grayson, *Bipolar Disorder: Taking Your Bipolar Medication*, *at* www.webmd.com. Bipolar patients are also prone to discontinue their medication because it is difficulty for them to accept their condition and realize that they will not get better on their own. *Id*. As this appears to be a common symptom of the disease, rather than a contributing cause, we believe that this issue should be addressed by an expert. Specifically, the ALJ should question Amanda's treating physician(s) regarding the cause of Amanda's failure to take her medication and what effect, if any, it has on her RFC.

9

Further, the record does not contain an RFC assessment from any of Amanda's treating doctors. Instead, the RFC assessments were all prepared by non-examining, consultative doctors. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally constitute substantial evidence). Given the nature and complexity of Amanda's mental condition, we believe that this case should be remanded to allow the ALJ to obtain an RFC assessment from Amanda's treating doctor(s).

**Conclusion**:

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED this 3rd day of June 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE